Hurlbut *v.* Hutton.

Henry A. Hurlbut et al., surviving executors &c. of Benjamin H. Hutton, deceased,

*v.*

Charles Gordon Hutton, Anna Mary Hutton, Countess de Moltke-Huitfeldt, et al.

John N. Whiting et al., executors &c. of Benjamin H. Hutton, deceased,

*v.*

Adele Hutton, Marquise de Portes, et al.

1. Where the son of the testator borrowed, through his wife, who had a separate estate, a sum of money from his father, the testator, upon the security of her bond and pledge of her separate property for the repayment of the money with interest—*Held,* that an application, on behalf of the estate of the testator, to compel payment of the loan out of the legacy to the son under his father's will, would not be entertained on those facts alone.

2. The testator owned real property in France. By his will his executors had power of sale. Their application for instructions in respect to the sale of that property was refused on the ground that such sale was governed by the law of France.

3. By a provision of the will, the testator directed that out of his son's share of the residue two deductions should be made, one of $200,000, and the other of $50,000, and the balance invested for his son's life, for the son's benefit. By a codicil he directed his executors, after deducting the $200,000, to invest the remainder, and appropriate the income for the benefit of his son and his

---

Hurlbut *v.* Hutton.

---

family.—*Held,* that the object of the testator in modifying the former provision was to change the appropriation of the income, and not to deprive the son of the $50,000, and that the latter was therefore entitled to the $50,000.

4. By a codicil, the testator stated that he was about to convey certain real estate in France to his son's wife—*Held,* to be a mere expression of intention to grant to her by conveyance *inter vivos,* and not a devise by inference.

5. The testator directed that certain moneys advanced to his son-in-law, on the security of an estate of the latter in France, be deducted from the share of the wife of the latter (his daughter) in his estate, and that, upon payment of those moneys in that way, she should have the securities held by him therefor. —*Held,* that she is not entitled to the securities until, through a proper accounting, the debt has been paid out of her share.

6. The executors had full power to sell and convey the real property as their judgment should direct.—*Held,* that, in the absence of any allegation of misconduct on their part, they would not be required to convey the land to the legatees on account of their legacies.

7. A question in the cause under the will in reference to the appointment of executors was heard and disposed of by a vice-chancellor before the final hearing.—*Held,* that the cause must be considered as having been set down for hearing on that point, and could not be reheard, as a matter of course, upon the final hearing.

Bills for construction of will &c. On final hearing on pleadings and proofs.

*Mr. Cortlandt Parker* and *Mr. E. H. Landon* (of New York), for the executors.

*Messrs. Frederick Frelinghuysen, A. P. Whitehead* (of New York), and *Benjamin Williamson,* for the Countess de Moltke-Huitfeldt.

*Messrs. Benjamin Williamson* and *A. P. Whitehead,* for the Marquise de Portes.

*Mr. T. N. McCarter* and *Mr. John Cadwalader* (of New York), for Charles G. Hutton.

*Mr. Robert S. Green,* for the Marquis de Portes and the Comte de Portes.

Hurlbut *v.* Hutton.

The Chancellor.

Benjamin H. Hutton, late of West Orange, in the county of Essex, deceased, died February 17th, 1884. His wife was then dead. He left three children, Major Charles Gordon Hutton, Anna Mary, Countess de Moltke-Huitfeldt, and Adele, Marquise de Portes. The two daughters are widows. Madame de Moltke has no issue. Madame de Portes has two children, the present Marquis de Portes and the Comte de Portes. Mr. Hutton left a will with seven codicils. By the residuary clause (the twelfth) of the will he provided as follows:

"All the rest, residue and remainder of my estate, real as well as personal, of whatsoever nature and wheresoever situate, I give, devise and bequeath unto my executors, their heirs, executors and administrators, as joint tenants and not as tenants in common, in trust—

"1. To set apart and make a valuation and estimate of the same in gold or silver coin of the United States, or the equivalent of such coin in currency (so called), according to the then market rate of such coin in currency, and thereupon to invest, so far as shall not already be done, and keep invested, a sufficient amount and fund, not less than two hundred thousand dollars ($200,000), reckoned in American gold or silver coin as aforesaid; to pay the income of such amount and fund to my wife, Ann Hunter Gordon Hutton, during her natural life.

"If the income of the said fund shall not amount to the sum of ten thousand dollars ($10,000) per annum, reckoned in such gold or silver coin, then my executors shall take from the proceeds or income of the remainder of my said estate, or its income, a sufficient sum from time to time as may be necessary to ensure to my said wife the said sum of ten thousand dollars ($10,000) in such coin, per annum, payable half-yearly as aforesaid.

"2. After deducting the foregoing bequest of two hundred thousand dollars ($200,000) for the benefit of my wife, I desire my executors to set apart all the rest and remainder of my said residuary estate, and to add to and estimate with the same sum of one hundred thousand dollars ($100,000), provided in and by said contract of marriage, referred to in the second article hereof, to be paid to my daughter Adele and her husband, and thereupon to divide the aggregate, or sum thereof, into three parts, as follows: One part of forty (40) per cent. and two parts of thirty (30) per cent. each, and after such division to invest, if not already done, and keep invested, one of said parts of thirty (30) per cent., less the sum of one hundred thousand dollars ($100,000), in gold or silver coin, so as aforesaid heretofore contracted to be paid by me to my daughter Adele and her husband, which I direct to be deducted from said thirty per cent., and apply the income of said thirty (30) per cent., after such deduction, half-yearly, to the use of my said daughter Adele during her natural life,

2

free from the control or interference of her husband, or from any liability for his debts, and upon her death to assign and pay the same to her issue and their heirs, in equal shares *per stirpes.* But if she die without issue, then to my issue *per stirpes,* or if none of my issue be then living, to my next of kin, in equal shares *per stirpes.*

"3. The other thirty (30) per cent. of such aggregate, I direct my executors to invest, so far as not already done, and keep invested, and apply the income thereof, half-yearly, to the use of my daughter Anna, wife of the Count Harold de Moltke-Huitfeldt, during her natural life, free from all control, interference or dominion of her husband, and from any liability for his debts, and after her death, assign and convey the principal of said thirty (30) per cent. to her issue and their heirs, in equal shares *per stirpes.* But if my daughter Anna shall leave no issue at the time of her death, her surviving, and her husband, Harold, the Count de Moltke-Huitfeldt, shall survive her, the sum of thirty thousand dollars ($30,000) in gold or silver coin of the United States, part of the moneys herein directed to be invested for her benefit, shall be paid to her said husband absolutely, and the remainder of said thirty (30) per cent. *to go to my issue, or if none of my issue be then living, to my next* of kin, in equal shares *per stirpes.*

"4. If the remaining forty (40) per cent. of said aggregate above described, shall amount to four hundred thousand dollars ($400,000), I direct my executors to pay to my son, Charles Gordon Hutton, the sum of fifty thousand dollars ($50,000), reckoned in American gold and silver coin, (which I give him absolutely, and advise and request him to invest and keep invested in real estate), and my executors are thereupon to invest, so far as not already done, and keep invested, the remainder of said forty (40) per cent. of said aggregate, and apply the income thereof, half-yearly, to the use of my said son during his natural life. If the said forty (40) per cent. shall not amount to the sum of four hundred thousand dollars ($400,000), I direct that the whole of the said forty (40) per cent. be so invested and the income thereof applied to the use of my son as hereinabove directed, and upon his death, pay, assign and convey the principal or capital of such sum or fund to his issue in equal shares *per stirpes,* and in fee simple, or if he leave no issue him surviving, but leave his present wife him surviving, to keep invested the sum of thirty thousand dollars ($30,000), reckoned as aforesaid, in American gold or silver coin at its nominal or lawful value, and apply the income thereof, half-yearly, to her use during her natural life, if she remain so long unmarried, or during her widowhood, if she marry again, and upon her death or remarriage (whichsoever shall first occur), to pay, assign, convey and deliver the same to my issue then surviving and their heirs, in equal shares *per stirpes ;* or for want of such issue, to my next of kin then surviving and their heirs, in like shares *per stirpes.*

"5. Should either of my said children die, leaving no issue him or her surviving, the share of the residue of my estate devoted primarily to the benefit of such child, except as respects the share set apart for my son and his issue, and in case my son's present wife survive him, the fund of thirty thousand

Hurlbut *v.* Hutton.

dollars ($30,000), contingently appropriated for her benefit during her life, and except the thirty thousand dollars ($30,000) above bequeathed to Harold, the Count de Moltke-Huitfeldt, husband of my daughter Anna, is to go to increase the shares of such residue, held by my executors in trust for the benefit of the survivors and their issue respectively.

"6. After the death of my said wife the said fund of two hundred thousand dollars ($200,000) set apart for her use is to be divided in equal shares among my three children—Charles Gordon Hutton, Anna, Countess de Moltke-Huitfeldt, and Adele, Marchioness de Portes (all of whom are now residing in France), respectively, or if either of my said children shall not survive me, to his or her issue respectively, or leaving no issue, to the survivor or survivors of my said children, and if all be dead, to their issue, *per stirpes*, absolutely. If, at the time of my death, all my children shall be dead, leaving no issue, then the said fund to go to my next of kin *per stirpes*.

"I have heretofore become responsible for certain sums of money loaned to the Marquis de Portes (husband of my daughter Adele) by Auguste Seydoux, Seiber & Company, on his estate of Portes, in or near Mirepoix, France, and as I may make further loans and advances on said estate, or may purchase the same, it is my will that the whole of such loans, advances or purchase-money shall form part of and be deducted from the share or interest of my daughter Adele in and to my residuary estate, as provided for as before mentioned, and that the same and the securities taken upon such loans, be assigned and transferred to her as and for her sole and separate estate as aforesaid, and be subject in all things to the provisions of my will in respect of her said share. In the event of my purchasing or becoming the possessor of the said estate of Portes, in France, I give and devise the said estate of Portes to my daughter Adele if she survive me, if not, to her issue by the said Marquis de Portes. If my daughter Adele shall not survive me or shall die without issue, then the said estate of Portes shall go to my issue and their heirs, or if there shall, at the time of her death, be no issue of mine living, then to my next of kin in equal shares, *per stirpes*.

"If the share of my said residuary estate hereinabove provided to be paid to my daughter Adele, after deducting the said sum of one hundred thousand dollars ($100,000) referred to in the second article of my will, be insufficient to pay the amount of loans and advances I may have made at the time of my death on the said estate of Portes, then and in that case I direct that the excess of such advances over and above such share of my daughter Adele, after such deduction, be assumed and paid by my said daughter, and lawfully secured as a lien upon the said estate and paid to my said executors at such time and manner as may be just and reasonable."

By the first codicil (made June 6th, 1870), he made the following provision :

" Having purchased, in the year one thousand eight hundred and sixty-

seven, of Mr. Richard Lalor Power, his estate of Bilhere, and also certain other lands and premises near Pau, Basses Pyrenees, in France, and now owning the same absolutely in fee, it is my will that if, within three years after the date of my death, the said Richard Lalor Power, or any other person in his behalf, shall pay to my executors the amount actually paid by me for and on account of the said estate and the said lands and premises, and the mortgages thereupon, as appears by my books of account, together with interest thereon at the rate of seven per centum per annum, I hereby authorize and empower my executors to convey, by good and sufficient conveyance, all the said estate of Bilhere, and the said other lands and premises near Pau, as aforesaid, to the said Richard Lalor Power, his heirs and assigns, as he may direct.

" If, within three years from the date of my death, such payment shall not have been made by the said Power, or in his behalf as aforesaid, I order and direct my executors to sell the said estate of Bilhere, and the said other lands and premises, at public or private sale, to the best advantage practicable, and after applying the proceeds of such sale to the payment of all amounts which may have been, up to that time, paid by me for or on account of the said estate and lands and mortgages thereon, to invest the surplus, if any arising on such sale, in United States or state stocks or bonds, and to pay the income thereof, annually, to Sarah Gordon Power, wife of the said Richard Lalor Power, during her natural life, and after her death, to pay the principal and any accrued interest there may be to Bimba Power and Mary Power, daughters of said Sarah Gordon Power, or the survivor of them, in equal shares, or, in case of the death of either the said Bimba or Mary before the death of their said mother, to their issue *per stirpes.* Such payment to be for the sole use and benefit of the said Bimba and Mary, as their separate estate, free from all interference, control or debts of their respective husbands.

" If this disposition of the said property so purchased of the said Richard Lalor Power, and of its avails, shall, by the law of France, in any manner affect or impair the rights of any of my heirs, then it is my will that unless my said heirs shall in such manner as is required by such law signify their assent to such disposition of the said property and its avails, and transfer their respective shares in the surplus thereof, after payment of my advances thereon, to the said Richard Lalor Power, or the said Sarah Gordon Power and her daughters, in accordance with the provisions of this codicil, then and in that case, an amount equal to the share or proportion of such surplus, which those of my heirs who shall not consent to such disposition of such surplus would inherit by law, shall be deducted from that portion of my said estate which is by my said will bequeathed to such heir so not consenting, and shall be paid out of the bulk of my residuary estate to the said Richard Lalor Power, or the said Sarah Gordon Power and her two daughters, in the contingencies and events hereinabove provided for in respect of the said persons respectively."

This codicil contains the following, also:

Hurlbut *v.* Hutton.

"If my daughter Anna shall have issue, who shall, at the time of her death, be dead, then I direct my executors (after deducting thirty thousand dollars for her husband, Count Harold de ·Moltke-Huitfeldt, and to· be paid over by them to him) to pay the said thirty (30) per cent. and its avails to my issue; or, if none of my issue be then living, to my next of kin, in equal shares *per stirpes.*"

· The third codicil (made June 10th, 1872), contains the following provision :

"I change and modify subdivision four of article twelve of my said will, which relates to my son, Charles Gordon Hutton, as follows :

"I direct my executors to deduct from the forty per cent. bequeathed in said subdivision for the use of my said son and his heirs, such amount as shall be found charged on my said books of. account, under the heading 'Charles Gordon Hutton, special account.' If, at the time of my death, all the said debts of my said son shall not have been paid, and there shall be charged to him in said special account on my said books a sum less than two hundred thousand .dollars, and not otherwise, I hereby direct my executors to deduct from said forty per cent. a sum which, when added to the amount so charged to my said son, on ·said special account, shall not exceed, in the whole, the sum of two hundred thousand dollars, and to apply such sum to the payment of such of the said debts as may remain unliquidated, in such manner and proportion as my said son shall designate.

"Out of the residue of the said forty per cent., after such deduction shall have been made, if there shall be so much, I direct my executors to pay to my said son the sum of fifty thousand dollars, and the whole of such residue, if it be less than fifty thousand dollars, which I give to him absolutely, and request, and advise him to invest, and keep invested, in real estate; and the remainder, if any, of said forty per cent., after such deduction for said debts and said sum of fifty thousand dollars, as herein provided, I direct my executors to invest, and keep invested as they may see fit, and pay the income arising from such remainder to my said son during his life; and, after his death, to pay the principal of such remainder to his issue in equal shares *per stirpes,* and in fee simple; and, if my said son leave no issue him surviving, but leave his present wife surviving him, I direct my executors to invest the sum of thirty thousand dollars of such remainder, if there be so much, and the whole thereof, if it be less than such sum, and keep the same invested as they may see fit, and pay the income arising therefrom, half-yearly, to her use during her natural life, if she remain so long unmarried, or during her widowhood, if she marry again; and, upon her death or re-marriage (whichsoever event first occur), to pay, assign, convey and deliver the same to my issue then surviving and their heirs in equal shares *per stirpes,* or, for want of such issue, to my next of kin then surviving, and their heirs, in like shares *per stirpes.*

"In no event shall the sum so charged to my said son in my said books of

account be deducted from, or otherwise affect or impair, the amounts provided and directed in and by my said will, to go to my wife and to my two daughters, or any of the other legatees besides my said son.      And in no event shall more be paid to or received by my said son than the forty per cent. so as aforesaid bequeathed to him in and by my said will, less the amount charged to him on my said books of account under the said heading of ' Charles Gordon Hutton, special account.'

"No interest is to be charged to my said son in the said account on my books."

The fourth codicil (made August 2d, 1873), provides as follows:

"I change and modify so much of the twelfth (12th) article of my said will as relates to the payment of the bequest to my son, Charles Gordon Hutton, and also so much of the second codicil to my said will as relates to the bequest to said Charles Gordon Hutton as follows:

"I direct my executors, after deducting, in pursuance of the terms of the said codicil, the sum of two hundred thousand dollars ($200,000) from the forty (40) per cent. provided in the said twelfth (12th) article to be invested for the benefit of my son, to invest and keep invested the remainder of said forty per cent. as they may see fit, and pay and appropriate from time to time, as may be necessary, the income and avails thereof to the maintenance and support of my said son and of his wife, and the maintenance, support and education of their children, severally as well as jointly, in such way as may befit their circumstances and station in life, during the life of my said son; and, after his death, I direct my executors to deduct from the fund then in their hands, for the benefit of my said son and the several members of his family, the sum of thirty thousand dollars ($30,000), and to divide the remainder thereof into as many shares as there shall be children of my son then living, or who, being dead, shall leave issue, and to pay to each of said children, when he or she shall respectively attain the age of twenty-five years, an equal share of said fund as so divided, and also to pay to such issue, equally, the share to which their parent would have been entitled had such parent attained the age of twenty-five years.

"Each of said children, and the issue of any child deceased, shall, in the meantime, receive so much of the income of the share so bequeathed to them respectively until the time of the payment of said principal as herein provided, as, in the discretion of my executors, may be necessary for their proper maintenance, support and education.

"The income from the said thirty thousand dollars ($30,000) so deducted from such remainder of said forty per cent. to go to Henrietta McCarty, the wife of my said son, until her death or marriage, and the principal to be distributed, in case of her death or marriage, as provided in the said second codicil to my said will.

"In all other respects then, as herein provided, I confirm and declare the said will, and the first and second codicils thereto, to be in full force and effect."

The sixth codicil (made June 22d, 1875), contains the following provision :

"I am about to dispose of the estate of Bilhere, near Pau, in France, mentioned in the foregoing codicil to my last will and testament, and to provide in the manner contemplated by such codicil for Mrs. Sarah Gordon Power and her two daughters, Bimba Power and Mary Power. In the event of my making such disposition or any arrangement and provision for the said persons, it is my will that all the provisions of the foregoing codicil to my said will relating to the said estate of Bilhere and to the said Sarah Gordon Power, Bimba Power and Mary Power respectively, shall be and hereby are revoked and canceled."

The seventh codicil (made November 19th, 1880), contains the following :

"I am about conveying to Mrs. Henrietta Hutton, wife of my son, Charles G. Hutton, the house and lands at Bilhere, as now occupied by my son, for her separate use and benefit; this grant of this property is not to be charged against my son or his said wife as an advancement or otherwise, nor is it to affect any provision of my will in behalf of my said son or of his said wife."

It appears from the evidence that in October or November, 1880, the testator directed his son to have a deed from him to the latter's wife for the Bilhere property drawn up. It was drawn accordingly, but on account of the illness of the testator it was not presented to him, and he died without executing it. The property consists of two parcels of land, on one of which is a small house. The testator's son occupied the premises with his family for several years before and up to his father's death without rent, the testator giving him the use thereof, and making an allowance of $2000 a year to each of his (the testator's) two daughters, during the same time, for the payment of house rent. While the son was so occupying the premises, the testator sold part of the property upon which was a stable upon which, in fitting it up and arranging it, the son had gone to considerable expense. There was also upon it a small stone house which the

son had built for his coachman and other men servants. In consequence of that sale, the son was compelled to rent the stable and the small stone house from the purchaser. The son made, at the suggestion of the testator, certain improvements in the dwelling-house upon the property, at a cost of about $3500. He paid taxes and assessments upon the property, and filled in the land to a very considerable extent. He claims that his expenditures upon the property were made under an understanding with the testator that the latter was to give him the property. And he claims also that under all the circumstances of the case he is entitled to a decree awarding the property to his wife.

In 1881 the testator, with the consent and at the request of his three children, lent $50,000 to the wife of his son, taking as security her bond, dated September 6th in that year, payable in one year, with interest, and an agreement from her to give him a mortgage upon her share (one-third) of her deceased father's real estate in the city of New York, for the partitioning whereof proceedings were then pending, so soon as such share should be set off in severalty to her, or to pay him the money out of her share of the proceeds of the sale of the property in case it should be sold under those proceedings. The money was borrowed for her husband's benefit and went to him. On or about July 24th, 1874, the testator executed with the Marquis de Portes, in France, in accordance with the law of that country, an antichresis upon the estate de Portes, which acknowledged a loan of 280,000 francs, and provided for a credit of 100,000 francs more, to be appropriated to the improvement of the estate. The testator, it is alleged, advanced all of the latter sum, and in addition to that money advanced other large sums, and there stands charged upon his books of account, up to and including January 1st, 1885, the sum of about $240,000, as having been paid out under the antichresis for the benefit of the estate de Portes at the request of the Marquis de Portes and his wife, the testator's daughter. The antichresis, by its terms, was given to secure, not only the payment of the 280,000 francs and the credit of 100,-000 francs, and the interest upon those sums, but also the repayment of all charges and other items.

Of the questions specifically presented by the bill in the case first above mentioned (*Hurlbut* v. *Hutton*), it is necessary to answer but two. The others have been disposed of by arrangement or agreement of parties. One of the questions to be considered is whether any part of the legacies to Charles Gordon Hutton should be applied to the payment of the $50,000 loan to his wife, and the other is as to what disposition the executors should make in reference to the Bilhere property. Of the questions presented by the cross-bill of the Countess de Moltke-Huitfeldt and the Marquise de Portes, but two remain. One is whether the provision for the payment of $50,000 to Charles Gordon Hutton, provided for in the fourth section of the residuary clause of the will and referred to in the third codicil, was not revoked by the above-quoted provision of the fourth codicil. The other is whether it is not the duty of the executors to set off to the two daughters, at their option, " certain real estate " of the testator on account of their legacies. By the bill in the case secondly above mentioned (*Whiting* v. *de Portes*) the complainants ask directions as to whether they shall, when the affairs of the estate de Portes shall have been fully settled and ascertained, charge the moneys due the testator therefrom against his daughter Adele (Marquise de Portes) and deduct them from the bequests to her; and if so, from which of them, and whether any part of the advances or payments is to be remitted to her or for her benefit, and what disposition the executors are to make of the antichresis and its several provisions according to the laws of France; and if, upon an accounting in respect to the payments and advances, the amount due shall be found to be greater than the value of the estate, whether they shall proceed to sell the estate and charge any remainder or deficiency to the account of Madame de Portes, or whether she shall have her election to take the estate at its fair value, to be ascertained by appraisement, and whether, in case the advances exceed the appraised value, the excess is to be charged to her against the bequests in her favor; and whether, in case of an appraisement, it should be found that the amount of the valuation of the estate exceeds the amount due for advances, Madame de Portes and her children, the present

Marquis de Portes and Comte de Portes, may be directed and required to pay off the amount due for advances and take a discharge or assignment of the antichresis; and the bill further prays that in case Madame de Portes and her children refuse to pay or otherwise adjust the money due for the advances, the executors may be instructed how to proceed to enforce the antichresis according to the laws of France, and to hold Madame de Portes liable, so far as the bequests to her are concerned, for any deficiency. The executors ask also whether they are to charge the $100,000 provided for in the ante-nuptial agreement between Madame de Portes and her late husband, and known as her *dot*, with the payment, so far as it will go, of the advances made for the estate de Portes. They also inquire whether, in case of the death of Madame de Moltke without issue, the thirty per cent. mentioned in the residuary clause of the will, the interest whereof is payable to her for life, will, on her decease, go to the executors to be held as part of the estate for the benefit of her brother and sister for life, with remainder to their issue, or whether it will go immediately to the brother and sister or their issue.

The $50,000 loan was made by the testator to the wife of Charles G. Hutton. She gave him her bond with an agreement pledging her own separate property to secure the repayment of the money, with interest. Her husband admits that the loan was for his benefit, and that the security therefor was given with his knowledge and at his request, and that he received the money. He insists that the loan was amply secured. The bill gives no reason for seeking payment of the loan out of the legacies to him. The executors do not appear to have failed in any effort to collect the money. Indeed they do not appear to have attempted to collect it. Nor do they suggest that there is any obstacle in the way of collecting it. There seems to be no occasion for either asking or giving instructions on the subject. Nor does there seem to be any occasion for considering what equity would require in case the money so lent, at the request and for the benefit of the husband, upon the wife's bond and agreement, must be lost to the estate, unless it be retained out of the money coming to the husband under the will.

As to the Bilhere property. The first reference to it is made in the first codicil, where the testator provides for the convey- ance of the premises, by his executors, to Richard Lalor Power, his heirs or assigns, on the payment to the executors, within three years from the date of the testator's death, of the amount actu- ally paid by the testator for and on account of the property and the mortgages thereon, with interest. He provides also that if Power should not make such payment within the limited period, his executors shall sell the property, and after applying the pro- ceeds, so far as necessary, to making such payment, invest the surplus for the benefit of Power's wife, for her life, with remain- der to her two daughters or their issue. By the sixth codicil (which was made in 1875) he declares that he is about to dispose of the property, and to provide, in the manner contemplated in the fifth codicil, for Mrs. Power and her two daughters, and provides that in the event of his making such disposition or any provision or arrangement for those persons, all the provisions of the fifth codicil, relating to the property and to Mrs. Power and her daughters, be revoked and canceled.

By the seventh codicil (which was made in 1880, about five years afterwards) he says:

"I am about conveying to Mrs. Henrietta Hutton, wife of my son, Charles G. Hutton, the house and lands at Bilhere, as now occupied by my son, for her separate use and benefit. This grant of this property is not to be charged against my said son or his said wife as an advancement or otherwise, nor is it to affect any provision of my will in behalf of my said son or of his said wife."

Charles G. Hutton says that at or about the time of making that codicil (November, 1880), the testator said to him that he would convey the property to his (Charles G. Hutton's) wife; and he further says that he was directed to have a deed drawn accord- ingly, and he did so, but that it was not executed, merely because of the testator's illness. In fact, it was never presented to him for his signature, although he lived for more than three years afterwards. He did not die until February, 1884. That he was capable of doing business after the time of making the sev-

enth codicil sufficiently appears from the fact that the loan of
$50,000 to his son's wife was made in September, 1881, nearly
a year afterwards.

The property in question did not pass to Charles G. Hutton's
wife by the clause in the seventh codicil. That clause is merely
expressive of an intention on the part of the testator to convey
the property, at a future time, to his daughter-in-law, and it
provides that in the event of his making such conveyance, the
grant should not be charged to her or to her husband, either as
an advancement or in any other way, and that it should not affect
any provision in the will in favor of either of them—that is, in
case he should convey the property to her, it was to be regarded
as a gift, independent of any provision of the will, in favor of
them, or either of them. This mere expression of an intention
to grant by deed, or other appropriate conveyance, *inter vivos*,
is not, and cannot be construed to be a devise. The provision
is not only not a devise, but it is not even expressive of an inten-
tion to devise. The law upon the subject of *implied devises is*
thoroughly settled. The policy of the law, and the leaning of
the courts, is against the doctrine of devises by implication.
*Holton* ads. *White, 3 Zab. 330.* To create a devise by inference,
the implication must be a necessary one, there must be such a
strong probability of an intention to devise that an intent to the
contrary cannot be supposed. *2 Pow. Dev. 199.* Said Lord Eldon,
in *Dashwood* v. *Peyton, 18 Ves. 27, 41*: "I find no authority
for holding a mere recital, without more, to amount to a gift or
demonstration of an intention to give." Even where a testator
in the codicil recites that by his will he has made a devise or
bequest, which does not there appear, the codicil does not, by
such recital, create that bequest or devise. Sir John Romilly,
M. R., in *Re Arnold's Estate, 33 Beav. 163, 171.* Where a
testator bequeathed all his real and personal estate to a person
whom he named, but stated that on his (the testator's) death his
father's property would, under his father's will, devolve upon
his nephews, which was not the fact, for it formed part of the
testator's estate, it was held that the father's property did not
pass under the will. *Circuitt* v. *Perry, 23 Beav. 275.* The law

Hurlbut *v.* Hutton.

upon the subject is clearly laid down in *Denise* v. *Denise, 10 Stew. Eq. 163.* See, also, *McCoury* v. *Leek, 1 McCart. 70.* In the case before me there is no recital of a devise, nor any expression or indication of any intention to devise. The testator merely said that he meant soon to convey the property to his daughter-in-law. He lived for several years afterwards, and never made the gift. The presumption is that he changed his mind in reference to the matter. But whether he abandoned the design or not is of no consequence. It is enough to say here that he did not devise the property to the daughter-in-law. Nor is there any evidence of any contract upon which, if such claim were made in the pleadings, it could be held that the testator was bound either to convey or devise the property to his daughter-in-law, and that, in view of the fact that he neither devised nor conveyed, equity would decree a conveyance by his heirs or devisees. It may be added that for aught that appears the provision in the first codicil, for the benefit of Mr. Power, is still in force. The three years from the time of the testator's death, within which Mr. Power had the privilege of buying, will not expire until February, 1887, and the contingent provision for the benefit of Mrs. Power and her daughters is for a sale, by the executors, after the expiration of the three years, in case Mr. Power should not purchase. Nor can this court give the executors directions as to the conveyance of the Bilhere property. Whether they can convey it or not, depends upon the law of France. It is in evidence by the opinion of an expert in the law of that country, introduced by the consent of parties, that under those laws the executors cannot convey it, and that the title to the property is in the children of the testator. By the first codicil the testator, in view of the fact that his executors might not be able, under the law of France, to make conveyance of the property, as directed by that instrument, directs that in case of such liability, on the part of the executors, his children be practically put to an election. No question has, as yet, arisen on that head.

As to the $50,000, which by the residuary clause of the will and by the third codicil the testator expressly directs the execu-

tors to pay to his son. By the will, the testator orders that if forty per cent. of his residuary estate shall amount to $400,000, the executors shall pay to his son $50,000, which he gives to him absolutely, and that they shall invest the residue of the forty per cent. for the benefit of his son for life; the principal, upon his son's death, to go to his son's family. By the third codicil, he provides for the deduction of $200,000 from the forty per cent., and then directs that out of the residue of the forty per cent. his executors pay to his son $50,000, if there be so much left; and if there should be less than that sum left, that they pay him the whole of the residue; and if there should be any remainder after deducting the $250,000 from the amount of the forty per cent., that it be invested for his benefit for life, and that they pay the principal, at his death, to his issue. By the fourth codicil, referring to the twelfth article of the will, and to the third codicil (which he designates as the second, probably because having previously revoked the second codicil he regarded it as if it had never been made), he directs that his executors, after deducting, in pursuance of the terms of the third codicil, the $200,000 from the forty per cent., which it is provided in the twelfth article of the will shall be invested for the benefit of his son, invest and keep invested the remainder of the forty per cent., and pay and appropriate as may be necessary the income and avails thereof to the support of his son and his son's wife and the maintenance, support and education of their children &c., and that after his son's death they distribute and dispose of the fund as directed by that (fourth) codicil. The sole object of the testator in modifying by the fourth codicil the provisions of the will, and of the third codicil in respect to the forty per cent., was to provide for the payment or appropriation during his son's life of the income of the money to be invested to the support of his son and his son's wife and the support and education of their children (by the will and the third codicil he had directed that it be paid to his son alone), and to make a different disposition of the fund after his son's death from that which was made by those instruments. There is no evidence in the provisions of the fourth codicil that he intended to deprive his son

Hurlbut *v.* Hutton.

of the $50,000. What he deals with there is the fund which by the will he had provided should be "invested" for the benefit of his son. His language is:

"I direct my executors, after deducting, in pursuance of the terms of the said codicil [the third,] the sum of $200,000 from the forty per cent. provided in the said twelfth article to be invested &c."

But he had not by the will directed that the forty per cent. be invested, but only so much of it, if any, as might remain after deducting the $50,000. And by the third codicil he had directed the investment of only so much of the forty per cent. as should remain after deducting the $200,000 and the $50,000. By both the will and the third codicil he had given to his son the $50,000 absolutely, and with his special advice and request as to the manner in which he should invest it—in real estate. He does not, by the fourth codicil, revoke that gift expressly nor does he refer to it. Had he intended to revoke it, it is reasonable to presume that he would have done so expressly. The fund which he had in mind in the provision of the fourth codicil was evidently not the forty per cent., but only that part of it which by the will and third codicil, taken together, he had directed the executors to invest, that is, what should remain after deducting the $50,000 and the $200,000. The son is entitled to the $50,000.

As to the question whether it is the duty of the executors to set off to the testator's daughters, at their option, certain real estate (not designated) of the testator on account of their respective legacies. The will gives the executors full power to sell at public or private sale, and to assign, demise, grant and convey, for such terms or estates, and on such terms as shall in their judgment be most for the benefit of the estate, all the testator's property, real and personal. It manifestly would not be proper to direct the executors to convey to the daughters, at their option, real estate of the testator on account of their legacies. It might or might not be to the interest of the estate to do so. That matter, in the absence of any charge that the executors have abused or meditate an abuse of the discretion given to them by

the testator for the benefit of his estate, must be left to their discretion.

It remains to consider the question presented as to the duty of the executors in reference to the de Portes estate. The testator, speaking at the date of the will, says that he has become responsible for money lent to the Marquis de Portes by Auguste Seydoux, Seiber & Co., upon the estate of Portes, and that he may make further loans and advances upon that estate or may purchase it, and he then provides that the whole of such loans and advances or purchase-money shall form part of and be deducted from the share or interest of his daughter Adele (wife of the Marquis de Portes) in and to his residuary estate, and that the same and the securities taken upon such loans shall be assigned and transferred to her as and for her sole and separate estate, and be subject in all things to the provisions of the will, in respect to her share; and that in the event of his purchasing or becoming the possessor of the estate, he gives and devises it to her, if she should survive him; but if she should not survive him, he gives it to her issue by the Marquis de Portes; and if she should not survive the testator or should die without issue, then the estate shall go to the testator's issue and their heirs; or if there should, at the time of her death, be no issue of the testator living, then it shall go to his next of kin. He also provides that if her share of the residuary estate, after deducting the $100,000 referred to in the second article of the will, should be insufficient to pay the amount of the loans and advances which, at the time of his death, he might have made upon the estate de Portes, then and in that case he directs that the excess of such advances over and above her share, after such deduction of $100,000 previously mentioned, be assumed and paid by her, and lawfully secured as a lien upon the de Portes estate, and be paid to his executors at such time and in such manner as may be just and reasonable.

The provisions of the will, in reference to the subject under consideration, are plain, explicit and comprehensive. The testator, stating that he had become guarantor for money lent to the Marquis de Portes by Seydoux, Seiber & Co., upon the

estate de Portes, and that he might make other loans and advances upon the estate, or might purchase it, directs that the whole of such loans or advances form part of and be deducted from the share or interest of his daughter Adele, in and to his residuary estate, and that the loans or advances and the securities taken therefor shall be assigned and transferred to her, as and for her sole and separate estate &c., and in case he should purchase the estate, he devises it to her if she should survive him, but if she should not survive him, he devises it to her issue. Her share of the residuary estate, after deducting the $100,000, payable under her marriage contract, appears to be sufficient to repay the loans and advances with the interest; for, according to her answer, the executors have paid the $100,000 over to her. It appears also, by the answer, that the testator advanced the money to pay the loan made by Messrs. Seydoux, Seiber & Co., and that the amount is covered by the antichresis. Whatever is due upon a proper accounting to the testator's estate for the loans and advances and interest thereon, is chargeable upon Madame de Portes's residuary share. Should that not be sufficient to pay the amount, she will not be entitled to the securities until she shall have paid the balance.

It is not necessary to give direction to the executors in reference to the disposition to be made at the death of Madame de Moltke of the thirty per cent., the income whereof is given to her for life. The direction sought has reference to a state of facts which is merely hypothetical.

During the pendency of these suits a petition was filed in the case of *Hurlbut* v. *de Portes*, by the daughters of the testator, to get the aid of the court in filling the quota of executors. Two of the executors named in the will predeceased the testator. The appointment of one was revoked by a codicil. Two declined to serve. Two qualified. The person whose appointment was revoked by the codicil was, on the application of the executors who proved the will, appointed an executor by the supreme court of the state of New York. Since that time one of the two who qualified under the testator's appointment has died. By the will the testator authorizes and empowers and requests his executors,

and, from time to time, all other persons who may have been appointed and qualified as such, whenever the number of those of them who have qualified shall have been reduced by death, resignation, removal or other incapacity, to three, to join with the persons of full age beneficially interested in his estate, and competent to act, in appointing, by deed, other persons, not exceeding three at any one time, to be executors and trustees with them of and under the will; and provides that upon such deed being presented to, and filed and recorded with the proper court, magistrate or officer, the persons so appointed be, upon qualifying, executors of and trustees under the will, in like manner and with like powers and discretion as those originally named thereunder, the same to every practicable purpose and intent as if so originally named. The matter came on for hearing upon the petition and answer thereto, before one of the vice-chancellors, and was duly heard and considered by him. His conclusions are before me. He advised that an order be made, fixing a time and place when and where the parties interested should name persons, from whose number one could be selected for appointment•according to the will. The matter was disposed of by a decretal order. It cannot be reheard, as a mere matter of course, upon the final hearing. Though it was heard upon petition (and answer thereto), and the cause was not formally set down for hearing upon that point, it was substantially so set down. I must treat the matter as having been duly disposed of upon final hearing. It may be added that no application was made for a rehearing.